1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    JORGE ARVIZU, individually and as          No.  1:21-cv-00890-KES-SKO
      successor-in-interest to Krystal Lee Arvizu
12    aka Krystal Lee Church,

13                       Plaintiff,               ORDER GRANTING DEFENDANTS'
                                                  MOTION FOR SUMMARY JUDGMENT
14          v.
                                                  (Doc. No. 38)
15    FRANCIS HAMMON and ANTHONY
      ALVARADO,
16
                         Defendants.
17

18

19          This matter is before the court on the motion for summary judgment filed by defendants

20    Francis Hammon and Anthony Alvarado on January 12, 2024.  (Doc. 38.)  The motion was taken

21    under submission on the papers pursuant to Local Rule 230(g) on January 16, 2024.  (Doc. 41.)

22    On March 14, 2024, this case was reassigned to the undersigned.  (Doc. 45.)  For the reasons

23    explained below, the court finds the defendants are entitled to qualified immunity and their

24    motion for summary judgment will be granted.

25                                      **BACKGROUND**

26          This case arises from the tragic lethal shooting of plaintiff Jorge Arvizu's wife, Krystal

27    Lee Arvizu ("Arvizu") by Officer Hammon on June 8, 2019, following a call for assistance

28

                                              1

1    plaintiff made to the Fresno Police Department ("FPD").[1]

2    **A.    Procedural Background**

3        On June 4, 2021, plaintiff brought this action asserting constitutional claims under 42

4    U.S.C. § 1983 against defendants Hammon and Alvarado for excessive force, and against the City

5    of Fresno for municipal liability pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*,

6    436 U.S. 658 (1978).  (Doc. 1.)  Following plaintiff's unopposed dismissal of his claim against

7    the City of Fresno, the case proceeded on plaintiff's second amended complaint ("SAC") filed

8    January 12, 2024.[2]  (Doc. 37.)  The SAC asserts a single cause of action under 42 U.S.C. § 1983

9    against Hammon and Alvarado for excessive force in violation of the Fourth Amendment.[3]  (*Id.*)

10   On January 16, 2024, defendants Hammon and Alvarado filed their answer to the SAC.  (Doc.

11   39.)

12       On January 12, 2024, defendants Hammon and Alvarado filed the pending motion for

13   summary judgment.  (Doc. 38.)  They argue that they did not violate Krystal Arvizu's

14   constitutional rights and that they are entitled to qualified immunity.  (*Id.* at 14–27.)  Plaintiff

15   filed an opposition to the motion on January 26, 2024.  (Doc. 43.)  On February 5, 2024,

16   Hammon and Alvarado filed their reply, along with objections to certain evidence presented in

17   plaintiff's opposition.  (Docs. 44; 44-3 at 1–8.)  On April 23, 2024, defendants Hammon and

18   Alvarado filed a notice of supplemental authority, directing this court's attention to the Ninth

19   Circuit's decision in *Hart v. City of Redwood City*, 99 F.4th 543 (9th Cir. 2024), which was

20   issued after the briefing on the pending motion.  (Doc. 46.)

21

22   ---

23   [1]  For clarity, plaintiff Jorge Arvizu is referred to throughout as plaintiff.  Decedent Krystal Lee
     Arvizu is referred to as Krystal Arvizu or Arvizu.

24   [2]  The parties filed a stipulation to dismiss plaintiff's second cause of action with prejudice and to
25   dismiss the City of Fresno from the lawsuit.  (Doc. 33.)  The magistrate judge construed the filing
     "as an unopposed motion seeking leave to amend under Rule 15" and granted the motion.  (Doc.
26   34.)

27   [3]  The SAC does not include any claim against the City of Fresno.  Accordingly, the Clerk of the
     Court will be directed to update the docket to reflect that the City of Fresno was terminated as a
28   defendant in this action when plaintiff filed the SAC on January 12, 2024.

**B.      Factual Background[4]**

On Saturday, June 8, 2019, at approximately 8:49 a.m., FPD officers were dispatched to a residence in Fresno, California, where plaintiff and his wife Krystal Arvizu resided, after plaintiff called FPD's non-emergency line.  (DUF ¶¶ 1, 7.)  The audio recording and transcript of plaintiff's call reveals that he and his wife were in an argument while the line was open, and at times plaintiff was connected with dispatch but not communicating with the dispatcher.  (Doc. 38-1 at 34.)  Among other things, plaintiff can be heard yelling for Krystal Arvizu to let go of him while she yells, "Kill me."  (Doc. 43-3 at 40.)  After plaintiff began speaking with dispatch, Krystal Arvizu stated, "He punched me in the face yesterday."  (*Id.* at 43.)  Shortly afterwards, Arvizu's voice fades and is no longer heard on the audio recording.  (*See* Doc. 38-1, Exhibit F at 04:08–04:14.)

Plaintiff reported to dispatch that his wife was combative, that she was having a mental episode, that she had been committed to mental institutions before, that she had been drinking alcohol, that she possibly had a knife, and that she had locked herself in a bedroom.  (DUF ¶ 2; PADF ¶ 58.)  Dispatch provided the following information to FPD officers over radio traffic:  the call was a zero-priority call, which is the highest priority call, it was an open line and the voices on the phone were talking about killing, and the male voice on the line was calling the female voice a demon.  (DUF ¶ 4.)  Dispatch noted that there had been prior FPD calls to the address but could not confirm an apartment number.  (Doc. 38-1 at 22–23.)  Dispatch also broadcasted that Krystal Arvizu had locked herself in a bedroom, was "possibly armed with a knife," and was "reportedly having a 1 Mary episode."  (Doc. 38-1 at 23; DUF ¶ 6.)  The parties dispute whether the term "1 Mary episode" meant that "there *may* [have been] mental health issues going on" or whether it referred to "the specific information that Krystal was reported to be in the midst of a mental health crisis."  (DUF ¶ 5.)

---

[4]  The relevant facts that follow are undisputed unless otherwise noted and are derived from the undisputed facts submitted by defendants, responded to by plaintiff, and replied to by defendants (Doc. 44-1 ("DUF")); the additional disputed facts submitted by plaintiff and responded to by defendants (Doc. 44-2 ("PADF")); as well as declarations and exhibits attached to the pending motion and opposition.  (Docs. 38-1; 43-3.)

Officer Hammon and fellow FPD Officers Ryan Engum and Jose DeLeon arrived on the scene at approximately 8:56 a.m. (DUF ¶ 7.) Defendant Sergeant Alvarado arrived on the scene at approximately 8:57 a.m. (Doc. 38-1 at 7.) Officer Engum was designated the primary officer on the scene based on the call coming out of his beat. (DUF ¶ 7.) Officers Hammon and DeLeon took on supporting "cover officer" roles. (*Id.*) Engum and DeLeon are not parties to this action.

Plaintiff asserts that the officers were required to comply with FPD Procedure 417 governing crisis intervention incidents. (*Id.*) FPD Procedure 417 "provides guidelines for interacting with those who may be experiencing a mental health or emotional crisis."[5] (Doc. 38-1 at 222.) Defendants dispute that FPD Procedure 417 applied to the instant call "[b]ased on the information that was provided [to the officers] by dispatch [indicating] this was a disturbance involving two people." (DUF ¶ 32.) Sergeant Alvarado testified in his deposition that FPD Procedure 417 was inapplicable to the call because the information reported by dispatch was incomplete; explaining, "we just had the one-sided reporting of the disturbance going on." (Doc. 38-1 at 48–50.)

The events that followed were captured on FPD body-worn cameras. Officers Hammon, Engum, and DeLeon made initial contact with plaintiff at the property's front gate. (Doc. 43-3, Exhibit M at 1:25–1:30.) Plaintiff, who was still on the phone with dispatch, escorted the officers inside the residence and immediately directed them upstairs, where Krystal Arvizu was in a bedroom. (*Id.* at 1:30–1:50.) Engum entered the home first, followed closely by DeLeon, with Hammon at the rear. (Doc. 43-3, Exhibit P at 0:01–0:14.) As the officers made their way up the narrow staircase, DeLeon asked plaintiff if there was anyone else in the house; Mr. Arvizu answered, "No." (DUF ¶ 8.) During this brief interaction, the officers did not ask any further

---

[5] The procedure defines a "person in crisis" as "[a] person whose level of distress or mental health symptoms have exceeded the person's internal ability to manage his/her behavior or emotions." (*Id.*) Among other things, the procedure encourages officers responding to a call involving a person in crisis to "assess the situation independent of reported information" and utilize "conflict resolution and de-escalation techniques" where appropriate. (*Id.* at 222–23.) Regarding supervisor responsibilities, the procedure states, "[a] supervisor should respond to the scene of a violent, combative, and/or barricaded person in crisis" and encourages, among other things, "secur[ing] appropriate and sufficient resources," "monitor[ing] any use of force," and "strategic disengagement." (*Id.* at 224.)

4

questions and plaintiff did not provide any other information.[6]

Defendants contend the officers continued upstairs to perform a welfare check on Krystal, as they believed this was a domestic violence call and wanted to ensure that she was not injured. (DUF ¶ 12.)  Hammon testified that he understood the situation to require performing "a welfare check on this individual" based on information that the call "regard[ed] killing, and [involved] a male and a female."  (Doc. 38-1 at 103.)  In contrast, plaintiff characterizes the situation as the officers responding to a call involving an individual who "may be experiencing a mental health or emotional crisis."  (PADF ¶ 65.)

Upstairs, the officers arrived on a small landing leading to two rooms; the door to Krystal Arvizu's room was closed while the door to the adjacent room was open.  (Doc. 43-3, Exhibit P at 0:20–0:33.)  After Engum performed a protective sweep of the open room, the officers repositioned themselves in front of the door to Arvizu's room:  Engum stood at the door, with DeLeon to his left and Hammon to his right.  (Id. at 0:33–0:45.)  Engum knocked on the door and spoke to Arvizu by calling out her name, twice identifying himself as Officer Engum, and requesting that she open the door.  (Id. at 0:45–0:58.)  Arvizu did not directly respond, but instead made several distressed statements, including: "Last night . . . he punched me in the face."  (Id. at 0:46–1:04.)  After Officer Engum made repeated attempts to communicate, Arvizu announced, "I'm not giving you an entrance to the room" and "You threw me away just like my family did," to which Engum replied, "Ma'am I've never talked to you before."  (Id. at 1:04–1:21.)

Engum then used a tool from his waistband to manipulate and open the lock on Arvizu's door.  (Id. at 1:21–1:41.)  During this time, Arvizu stated, ". . . but if today is the day I die, I die a good death and good riddance."  (Id. at 1:25–1:30.)  Engum then began pushing against the door but was met with resistance.  (Id. at 1:46–1:59.)  In his deposition, Engum testified that he

---

[6]  Neither Sergeant Alvarado nor Officers Hammon, DeLeon, and Engum requested any information from dispatch about previous calls involving the parties or the address.  (PADF ¶¶ 38, 63.)  Plaintiff has submitted FPD event reports documenting several prior calls for service involving Krystal Arvizu.  (Doc. 43-3, Exhibit C at 24–39.)  The most recent prior event report concerns a welfare check performed on April 19, 2019, in which the FPD responded to calls from Arvizu's aunt, who reported that Arvizu said she wanted to kill herself and had previously tried to hang herself.  (Doc. 43-3, Exhibit B at 21–23.)

1     believed a bedframe was blocking the door of Arvizu's room, although he was not certain.  (Doc.

2     38-1 at 150.)  As Engum forced the door open slightly, Arvizu announced, "Go ahead come in, I

3     want to die a good death, today is a good day to die.  I know how broken the mental health system

4     is." (Doc. 43-3, Exhibit P at 1:46–1:59.)  Hammon testified that he was concerned about a

5     suicide by cop scenario after hearing those statements.  (Doc. 43-3 at 119.)

6        With the door now slightly open, Engum saw that Arvizu was standing facing the door,

7     holding a long-handled axe at her waist with both hands, so he immediately closed the door.

8     (DUF ¶ 16.)  Arvizu, now in a more agitated state, exclaimed, "Go ahead! Make my day pigs"

9     and "You're going to have to shoot me to get me out of this fucking room!"  (DUF ¶ 17;

10     PADF ¶ 76.)  Engum told Hammon and DeLeon that Arvizu had an axe and advised dispatch of

11     the situation using his radio.  (DUF ¶ 18.)  Arvizu then swung the axe, striking the closed door

12     three times.  (DUF ¶ 19.)  The third blow caused the axe head to disconnect and travel through

13     the door toward the officers, narrowly missing Engum and Deleon, and hitting the wall opposite

14     the bedroom door.  (DUF ¶ 19.)

15        Engum immediately motioned towards the stairs and stated, "Let's get out of here."  (Doc.

16     43-3, Exhibit P at 2:17–2:19.)  The officers began retreating away from the door.  (Id.)  DeLeon,

17     who was closest to the stairs, traveled several steps down the stairway.  (Id. at 2:19–2:22.)

18     Engum also started to make his way down the stairs but halted when Hammon reached out with

19     his left hand to touch Engum's shoulder as Arvizu briefly opened and closed the door a few

20     inches while remaining in the room.  (Id.)  Hammon was still on the landing and abruptly turned

21     around in response to the door movement and aimed his gun at the door, instructing Arvizu three

22     times to stay back and twice to drop the axe.  (Id. at 2:22–2:28.)  Hammon and Engum were now

23     positioned together in the corner of the confined landing across from the door, with DeLeon

24     looking up at them from just a few steps below.  (Id. at 2:28.)  As Hammon shouted commands to

25     stay back and drop the weapon, Arvizu opened the door and lunged towards the officers while

26     holding a large kitchen knife in her right hand.  (Id. at 2:28–2:30; Doc. 38-1, Exhibit O at 216.)

27     As Arvizu ran at him, Hammon fired five shots with his handgun in rapid succession, striking

28     Arvizu.  (DUF ¶ 24.)  DeLeon's body-worn camera captured Arvizu moving the knife forward

and upward, nearly reaching Hammon's midsection with the blade as the second and third shots are heard.[7]  (Doc. 43-3, Exhibit O at 2:05–2:11.)  Hammon testified that he locked eyes with Arvizu when she opened the door and observed the knife she was holding.  (Doc. 38-1 at 118.)  Approximately three minutes elapsed from the officers' arrival at the scene to the shooting.  The officers rendered first aid to Arvizu after the shooting and requested medical assistance.  (DUF ¶ 25.)  Arvizu was transported to Community Medical Regional Center, where she was pronounced deceased.  (DUF ¶ 26.)

Defendants assert that Hammon was "posted for cover on the stairway landing" when the officers began moving towards the stairs and "had no means of retreat because of the confined area and the presence of the officers on the steps."  (DUF ¶¶ 20, 22.)  Plaintiff disputes the characterization that Hammon was posted for cover because Hammon initially turned his back towards the door during the retreat and during his deposition he could not describe the exact positioning of his feet at that moment.  (DUF ¶ 20.)  Plaintiff also asserts that the absence of any escape route was a result of Hammon's decision to halt Engum's retreat by touching his shoulder.  Plaintiff argues that the FPD body-worn camera footage shows that the officers had between seven and eight seconds to retreat between when Arvizu partially opened the door to when she emerged from the room and charged the officers with the knife.  (DUF ¶ 22.)

Sergeant Alvarado was at the Southwest District Station office doing administrative work when plaintiff's call came in.  (DUF ¶ 27.)  Alvarado testified that he wanted to respond to the call because, as a supervisor, he liked to "bounce around the different calls with officers" and be out in the field.  (Doc. 38-1 at 36.)  Based on the information provided by dispatch at the time, Alvarado testified that he was not concerned and did not "get[] to a point where [he] . . . ha[d] to assess something immediately."  (*Id.*)  Rather, what Alvarado heard from dispatch was "not

---

[7]  Plaintiff disputes that Arvizu was stabbing; however, the entire interaction was captured on video.  Footage from DeLeon's body-worn camera shows that Arvizu nearly reached Hammon with the knife as she was being shot.  (DUF ¶ 23.)  Hammon's body-worn camera shows that Arvizu's right arm was initially behind her body as she exited the room, and that she thrust it forward with the knife towards the officers as she ran at them.  (Doc. 43-3, Exhibit M at 4:02–4:04.)  Arvizu continued moving the knife forward with the point towards Hammon even as shots were fired.  (*Id.* at 4:02–4:05; Doc. 43-3, Exhibit O at 2:05–2:11.)

1  uncommon." (*Id.* at 36–37.)  The parties dispute whether the section of FPD Procedure 417

2  outlining supervisor responsibilities applied to the instant call and required Alvarado to respond.

3  (DUF ¶ 28.)

4       When Alvarado arrived at the residence, Engum, Hammon, and DeLeon were already

5  upstairs.[8]  (DUF ¶ 29.)  Alvarado remained outside the residence or on the ground floor and did

6  not have any contact with the responding officers until after the shooting.  (PADF ¶ 41.)

7  Alvarado testified that he could hear voices in the house and a "thump" noise upstairs, but that he

8  did not communicate with the officers when he entered the residence because he did not want to

9  divert their attention and create a distraction.  (Docs. 38-1 at 46-47; 43-3 at 87.)

10       Prior to the shots being fired, Alvarado did not request additional resources or seek to

11  procure information from dispatch about previous calls involving the parties or the address.

12  (PADF ¶¶ 35, 36, 38.)  Alvarado contacted plaintiff outside the residence one minute and twenty-

13  five seconds after arriving at the scene.  (DUF ¶ 30.)  This interaction is partially captured on

14  Alvarado's body-worn camera, although without audio.  (Doc. 43-3, Exhibit Q at 0:00–0:30.)

15  Alvarado testified that he did not ask plaintiff specific questions regarding Krystal Arvizu but

16  engaged in "kind of, just back and forth" conversation "because [plaintiff] had no one with him."

17  (Doc. 43-3 at 80–84.)  Providing a general summary of the interaction, Alvarado testified that

18  plaintiff expressed concern for himself and Arvizu and described Arvizu's prior injuries.  (*Id.* at

19  84.)

20       When Arvizu struck the axe against the door upstairs, Alvarado motioned for plaintiff to

21  remain outside and then entered the residence.  (Doc. 43-3, Exhibit P at 2:05–2:20.)  The video

22  footage shows Alvarado reaching the base of the stairs, not yet able to see his officers from

23  ///

24  ///

---

25  [8]  The FPD event report for this call indicates that Alvarado signaled his arrival at the scene at

26  8:57:37 a.m.  (Doc. 38-1 at 7.)  Alvarado was present on the scene for approximately two minutes and nine seconds before Arvizu was shot and killed.  (DUF ¶ 30.)  The event report shows that

27  the shots were reported at 8:59:48 a.m., and the videos reflect that the first shot was fired a few seconds before that.  (DUF ¶ 30; Doc. 43-3, Exhibit P at 2:29.)

28

around a corner, just seconds after they had halted their retreat.[9]  (*Id.* at 2:22–2:26.)  The video evidence shows that Alvarado first looked up the staircase and observed the officers as Hammon was discharging his firearm.  (*Id.* at 2:28–2:31.)

### LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.*  The parties must cite "particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1).  The court then views the record in the light most favorable to the nonmoving party and draws reasonable inferences in that party's favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).  The nonmoving party's version of the facts need not be credited if it is blatantly contradicted by video evidence.  *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018).  The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  *Matsushita*, 475 U.S. at 587 (citations omitted).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  If—as is the case here with respect to defendants' affirmative defense of qualified immunity—"the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party."  *Soremekun*, 509 F.3d at 984; *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005) ("[T]he

---

[9]  Citing Alvarado's testimony, defendants assert that he "observed the officers coming down the stairs," however, this assertion is contradicted by video evidence showing the officers had halted their retreat before Alvarado was able to peer around the corner.  (DUF ¶ 31; Doc. 43-3, Exhibit P at 2:22–2:31.)  Furthermore, audio from Alvarado's body-worn camera captured Hammon ordering Krystal Arvizu to stay back—when all officers had already halted—before Alvarado was in a position to observe the scene.  (Doc. 43-3, Exhibit Q at 0:35–0:40.)

1   moving defendant bears the burden of proof on the issue of qualified immunity.").

2          If the moving party meets its initial burden, the burden shifts to the nonmoving party to

3   produce evidence supporting its claims or defenses and "establish that there is a genuine issue of

4   material fact." *Matsushita*, 475 U.S. at 585.  The nonmoving party "must do more than simply

5   show that there is some metaphysical doubt as to the material facts." *Id.* at 586 (citation omitted).

6   "The mere existence of a scintilla of evidence in support of the [nonmovant's] position" is

7   insufficient to survive summary judgment. *Anderson*, 477 U.S. at 252.

8          In the endeavor to establish the existence of a factual dispute, the nonmoving party need

9   not establish a material issue of fact conclusively in its favor. *T.W. Elec. Serv., Inc. v. Pac. Elec.*

10  *Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  It is sufficient that "the claimed factual

11  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

12  trial." *Anderson*, 477 U.S. at 252 (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S.

13  253, 289 (1968)).  In addition, "[t]he mere existence of video footage of the incident does not

14  foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that

15  footage." *Vos*, 892 F.3d at 1028 (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

16         "If the nonmoving party fails to produce enough evidence to create a genuine issue of

17  material fact, the moving party wins the motion for summary judgment.  But if the nonmoving

18  party produces enough evidence to create a genuine issue of material fact, the nonmoving party

19  defeats the motion." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099,

20  1103 (9th Cir. 2000) (citing *Celotex*, 477 U.S. at 322).

21                                          **ANALYSIS**

22  **A.     Evidentiary Objections**

23         Defendants Hammon and Alvarado have submitted objections to certain evidence

24  presented in plaintiff's opposition.  (Doc. 44-3.)  They have also raised several general objections

25  in connection with plaintiff's statement of additional disputed facts and his response to

26  defendants' statement of undisputed facts.  (Docs. 44-1, 44-2.)

27         1.     Exhibits B, C, and G

28         First, defendants object to plaintiff's (1) Exhibit B: Fresno Police Department Event

Report ("April 19 Welfare Check report"), (2) Exhibit C: Five Fresno Police Department Event Reports ("Prior Calls for Service report"), and (3) Exhibit G: ("FPD Procedure 417"), based on relevance.

Under Federal Rule of Evidence ("FRE") 401, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. The court notes that "objections for relevance are generally unnecessary on summary judgment because they are 'duplicative of the summary judgment standard itself.'" *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021) (quoting *Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006)).

Here, the April 19 Welfare Check report, the Prior Calls for Service report, and FPD Procedure 417 are all relevant because they have some tendency to show that the officers would have had additional information concerning Arvizu if they had requested the prior call history from dispatch, which might have led them to approach the situation differently. What a reasonable officer would have done under the totality of the circumstances is of consequence in determining this action. Fed. R. Evid. 401. Therefore, defendants' objections to these exhibits are overruled.

### 2.   Mark Osuna's Deposition and Declaration

Next, defendants object to the deposition and declaration of plaintiff's police practices expert, Mark Osuna, a retired San Francisco Police Department captain. Defendants object under FRE 401 and 402 (relevance), 702 (testimony by expert witnesses), 703 (bases of an expert's opinion testimony), and 802 (hearsay).

*Relevance*—Here, the declaration and deposition are both relevant to the extent they provide guidance on generally accepted police practices and how they might have applied under the totality of the circumstances of this case.

*Testimony by Expert Witnesses & Bases of an Expert's Opinion Testimony*—A qualified expert witness "may testify in the form of an opinion or otherwise if . . . the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or

1   to determine a fact in issue;" if "the testimony is based on sufficient facts or data; [if] the

2   testimony is the product of reliable principles and methods; and [if] the expert's opinion reflects a

3   reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702.

4   "An expert may base an opinion on facts or data in the case that the expert has been made aware

5   of or personally observed" and "[i]f experts in the particular field would reasonably rely on those

6   kinds of facts or data in forming an opinion on the subject, they need not be admissible for the

7   opinion to be admitted."  Fed. R. Evid. 703.  While "[a]n opinion is not objectionable just because

8   it embraces an ultimate issue," Fed. R. Evid. 704, "an expert witness cannot give an opinion as to

9   her *legal conclusion*, i.e., an opinion on an ultimate issue of law."  *United States v. Diaz*, 876 F.3d

10  1194, 1197 (9th Cir. 2017).

11          Defendants label their objections under these rules as "speculative" testimony or

12  "improper" methodology, but do not identify any specific portions of the deposition or

13  declaration, much less explain why they are speculative or improper.  The court finds that

14  Osuna's education, training, and twenty-eight years of experience with the San Francisco Police

15  Department qualify him as an expert witness on police practices.  Furthermore, his specialized

16  knowledge would assist the trier of fact, his testimony and declaration are based on a review of

17  the relevant evidence in this matter, and reliable principles and methods appear to inform his

18  testimony and opinions on the facts of this case.

19          *Hearsay*—"At the summary judgment stage, we do not focus on the admissibility of the

20  evidence's form.  We instead focus on the admissibility of its contents."  *Fraser v. Goodale*, 342

21  F.3d 1032, 1036 (9th Cir. 2003).  "If the contents of a document can be presented in a form that

22  would be admissible at trial—for example, through live testimony by the author of the

23  document—the mere fact that the document itself might be excludable hearsay provides no basis

24  for refusing to consider it" on a motion for summary judgment.  *Sandoval*, 985 F.3d at 666.  Here,

25  Osuna could testify at trial to the contents of his declaration and deposition.

26          For these reasons, defendants' objections to Osuna's deposition and declaration are

27  overruled to the extent that Osuna does not provide "an opinion on an ultimate issue of law."

28  *Diaz*, 876 F.3d at 1197; *see also Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en

1  banc) (finding a rational jury could rely on an expert's declaration to assess claims of excessive

2  force on summary judgment), *disapproved of on other grounds by Lemos v. Cnty. of Sonoma*, 40

3  F.4th 1002 (9th Cir. 2022).

4       3.    <u>General Objections</u>

5       Defendants also object generally to certain facts in plaintiff's statement of additional

6  disputed facts and in his response to defendants' statement of undisputed facts.  "[O]bjections to

7  evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it

8  constitutes an improper legal conclusion are all duplicative of the summary judgment standard

9  itself."  *Burch*, 433 F. Supp. 2d at 1119.  "Factual disputes that are irrelevant or unnecessary will

10  not be counted" on summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

11  (1986).  To the extent the court relies on any objected-to facts in this order, the objections are

12  overruled.  To the extent defendants object to evidence not relied on for purposes of this ruling,

13  the objections are moot.

14  **B.    Defendants' Motion for Summary Judgment**

15       Defendants Hammon and Alvarado move for summary judgment on plaintiff's 42 U.S.C.

16  § 1983 excessive force claim on the basis that (1) Hammon's actions were objectively reasonable

17  under the totality of the circumstances; (2) plaintiff has failed to demonstrate that Alvarado is

18  liable, either individually or as an integral participant; and (3) Hammon and Alvarado are entitled

19  to qualified immunity.  (Doc. 38 at 14–27.)  "[I]n resolving a motion for summary judgment

20  based on qualified immunity, a court must carefully examine the specific factual allegations

21  against each individual defendant (as viewed in a light most favorable to the plaintiff)."

22  *Cunningham v. Gates*, 229 F.3d 1271, 1287 (9th Cir. 2000).  Accordingly, the analysis below

23  addresses each defendant separately—first considering Hammon's conduct before turning to the

24  issue of supervisory liability with respect to Alvarado.  Because defendant's argument that

25  Hammon's conduct was objectively reasonable is part of the qualified immunity analysis, it is

26  addressed in that context.

27       1.    <u>Fourth Amendment Excessive Force Claim:  Officer Hammon</u>

28       Under § 1983, a private right of action exists against anyone who, "under color of" state

1   law, causes a person to be subjected "to the deprivation of any rights, privileges, or immunities

2   secured by the Constitution and laws."  42 U.S.C. § 1983.  "Section 1983 does not create

3   substantive rights; it merely serves as the procedural device for enforcing substantive provisions

4   of the Constitution and federal statutes."  *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991)

5   (citing *Chapman v. Houston Welfare Rts. Org.*, 441 U.S. 600, 617 (1979)).  Qualified immunity

6   protects government officials from liability under § 1983 "unless (1) they violated a federal

7   statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established

8   at the time.'"  *D.C. v. Wesby*, 583 U.S. 48, 62–63 (2018) (quoting *Reichle v. Howards*, 566 U.S.

9   658, 664 (2012)).  "Qualified immunity balances two important interests—the need to hold public

10  officials accountable when they exercise power irresponsibly and the need to shield officials from

11  harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v.*

12  *Callahan*, 555 U.S. 223, 231 (2009).  Courts are "permitted to exercise their sound discretion in

13  deciding which of the two prongs of the qualified immunity analysis should be addressed first in

14  light of the circumstances in the particular case at hand."  *Id.* at 236.

15              a.    *Constitutional Violation*

16          The Fourth Amendment provides that "[t]he right of the people to be secure in their

17  persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

18  violated."  U.S. Const. amend. IV.  "A police officer's use of deadly force against a person

19  constitutes a seizure within the meaning of the Fourth Amendment."  *Calonge v. City of San Jose*,

20  104 F.4th 39, 45 (9th Cir. 2024) (citing *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)).  Claims of

21  excessive force in violation of the Fourth Amendment are analyzed under an "objective

22  reasonableness standard."  *Graham v. Connor*, 490 U.S. 386, 388 (1989).  "To assess the

23  reasonableness of a particular use of force, we balance the nature and quality of the intrusion on

24  the individual's Fourth Amendment interests' against the countervailing government interests at

25  stake."  *Hart v. City of Redwood City*, 99 F.4th 543, 549 (9th Cir. 2024) (internal quotation marks

26  and citation omitted).  "The reasonableness standard nearly always requires a jury to sift through

27  disputed factual contentions, so summary judgment in an excessive-force case should be granted

28  sparingly.'"  *Est. of Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 628 (9th Cir. 2022) (internal

1  quotation marks and citation omitted).

2        "The calculus of reasonableness must embody allowance for the fact that police officers

3  are often forced to make split-second judgments—in circumstances that are tense, uncertain, and

4  rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*,

5  490 U.S. at 396–97.  In this context, reasonableness is to be "judged from the perspective of a

6  reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396 (citing

7  *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)).  In addition, "[o]nly information known to the officer at

8  the time the conduct occurred is relevant." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir.

9  2019) (citing *Cnty. of Los Angeles, Calif. v. Mendez*, 581 U.S. 420, 428 (2017)).

10        Here, the nature and quality of the intrusion is of the highest level:  Hammon used deadly

11  force in shooting Arvizu.  *Garner*, 471 U.S. at 7 ("The intrusiveness of a seizure by means of

12  deadly force is unmatched."); *Est. of Aguirre*, 29 F.4th at 628 ("Deadly force is the most severe

13  intrusion on Fourth Amendment interests because an individual has a fundamental interest in his

14  own life and because, once deceased, an individual can no longer stand trial to have his guilt and

15  punishment determined.").

16        On the other side of the balance are the countervailing governmental interests at stake.  In

17  *Graham*, the Supreme Court set forth three factors to consider: "[1] the severity of the crime at

18  issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and

19  [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490

20  U.S. at 396.  These factors are non-exhaustive, but the most important factor is whether the

21  suspect posed an immediate threat.  *Calonge*, 104 F.4th at 45.  Courts must "examine the totality

22  of the circumstances and consider 'whatever specific factors may be appropriate in a particular

23  case, whether or not listed in *Graham*.'"  *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir.

24  2010) (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)).  "Other relevant factors

25  include the availability of less intrusive alternatives to the force employed, whether proper

26  warnings were given and whether it should have been apparent to officers that the person they

27  used force against was emotionally disturbed." *S.B. v. Cnty. of San Diego*, 864 F.3d 1010, 1013

28  (9th Cir. 2017).

Because it is undisputed that Hammon used the highest level of force against Arvizu, the constitutionality of his conduct turns on whether the governmental interests at stake were sufficient to justify it. *Vos v. City of Newport Beach*, 892 F.3d 1024, 1031 (9th Cir. 2018).

i.    Immediate Threat

Beginning with the most important factor, plaintiff does not dispute that Krystal Arvizu was an immediate threat when she charged the officers with a knife. (Doc. 43.) Taking the facts in the light most favorable to plaintiff, no reasonable jury could conclude that Arvizu did not pose an immediate threat to the officers at that moment. It is undisputed that Arvizu struck an axe against the door and that the third blow caused the axe head to travel through the door, narrowly missing Engum and DeLeon. There is no dispute that the area was confined and that Arvizu opened the door bearing a large kitchen knife. It is also undisputed that Arvizu did not comply with Hammon's orders to stay back and drop her weapon, and instead lunged at the officers while wielding the knife.

When a person is armed, "[a]n immediate threat might be indicated by a furtive movement, harrowing gesture, or serious verbal threat." *Calonge*, 104 F.4th at 46; *see also George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (noting that objective factors must justify an officer's perception of an immediate threat). In *Tennessee v. Garner*, the Supreme Court held that a police officer may not use deadly force "unless it is necessary to prevent escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Garner*, 471 U.S. at 3. From this principle, the Ninth Circuit has recognized that "where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force." *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (en banc) (collecting cases), *disapproved of on other grounds by Lemos v. Cnty. of Sonoma*, 40 F.4th 1002 (9th Cir. 2022).

Based on the undisputed facts, a reasonable officer on the scene would have objectively perceived Arvizu as an immediate threat after she struck the door with the axe. Observing an axe swung with enough force to break through a doorway and narrowly avoid fellow officers would have alerted a reasonable officer to the risk of physical injury posed by the axe-wielder. The

officers initially started to retreat at that point, but they stopped and turned back to face the doorway when Arvizu started to open the door.[10]  A reasonable officer operating within the confined location of the stairway landing would appreciate the greater threat the armed individual posed in that setting.  Arvizu's close proximity to the officers increased the likelihood of her inflicting injury while simultaneously limiting the officers' ability to maneuver out of harm's way.  An officer in that situation would reasonably believe Arvizu posed an immediate threat when she ignored repeated orders to stay back and drop the weapon and instead charged at the officer with a large kitchen knife.  These objective factors created a "tense, uncertain, and rapidly evolving" situation, highlighting the "split-second [nature of the] judgments" any reasonable officer on the scene would have been forced to make.  *Graham*, 490 U.S. at 396–97.

Plaintiff argues that Hammon would not have been in the position requiring him to shoot Arvizu if the officers had retreated more quickly from the doorway.  But the officers were at the doorway for slightly less than two minutes before Arvizu charged at them with the knife.  And less than ten seconds elapsed between when Arvizu struck the door with an axe, causing the officers to start to retreat, and when she ran out of the room with the knife.  Plaintiff disputes whether Arvizu attempted to stab the officers, but the video evidence shows that Arvizu rushed suddenly at the officers with the knife blade pointed toward Hammon and nearly reached him with the blade as she was shot.  *See Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018) ("The record is viewed in the light most favorable to the nonmovants . . . so long as their version of the facts is not blatantly contradicted by the video evidence"); *Scott v. Harris*, 550 U.S. 372, 378–79, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (same).  Regardless of whether Arvizu attempted to stab the officers or merely lunged at them while holding the knife, it is undisputed that she charged at the officers with a knife and closed in on them in a matter of seconds.  A

---

[10]  Arvizu was reported to be possibly armed with a knife.  A reasonable officer's perception of the threat therefore would have included the risk that Arvizu might be armed.  The fact that the door to Arvizu's room was closed during most of the interaction hindered the officers' ability to assess her threat level until she struck the door with the axe, at which point they attempted to retreat.  *Cf. Smith*, 394 F.3d at 702 (considering fact that suspect was in plain view of officers as part of determination that no immediate threat was posed), *disapproved of on other grounds by Lemos*, 40 F.4th 1002.

reasonable officer in that situation would objectively perceive Arvizu's conduct as an immediate threat.

Whether Hammon was attempting to retreat or was posted for cover while the other officers started to retreat does not affect the analysis.  It is undisputed that Hammon turned to face the door when Arvizu started to open it, knowing that she had been armed with an axe a few seconds earlier.  At that moment, a reasonable officer facing Arvizu from several feet away would perceive her as an immediate threat.  Although plaintiff argues that the absence of any escape route was due to Hammon having halted Engum's retreat by touching his shoulder, the video reflects that Hammon did that when Arvizu started to open the door and the officers turned back to face the potential threat.  The officers had no means of retreat when Arvizu charged from the room with the knife a few seconds later, after she failed to follow Hammon's orders to stay in the room and drop her weapon.

On these facts, no reasonable jury could conclude that Arvizu did not pose an immediate threat when she advanced on the officers while wielding a knife.  Furthermore, Ninth Circuit precedent establishes that an officer's use of deadly force is justified in response to threats from a suspect armed with a weapon.  *Smith*, 394 F.3d at 704.  Because this issue is the most important of the *Graham* factors, arguably the immediacy of the threat rendered Hammon's conduct objectively reasonable such that his use of force did not violate the Fourth Amendment.  *Hart v. City of Redwood City*, 99 F.4th 543, 552 (9th Cir. 2024) (finding the immediacy of the threat factor dispositive).  However, the other factors are also addressed below.

ii. Severity of the Crime

With respect to the severity of the crime factor, plaintiff argues that Arvizu committed no crime because the officers were responding to a mental health crisis.  (Doc. 43 at 20–22.)  However, when Arvizu emerged from the room armed with a knife and charged at the officers, there was probable cause to believe she was committing a misdemeanor offense under Cal. Penal

Code § 417(a),[11] and a felony offense under Cal. Penal Code § 245(c).[12]  (Doc. 38 at 19–20.)
There was probable cause to believe Arvizu committed assault under California law because she
"unlawful[ly] attempt[ed]," and had the "present ability, to commit a violent injury" on the
officers.  Cal. Penal Code § 240.  In addition, she knew, or reasonably should have known they
were police officers because she observed them in uniform and called them "pigs" before
attacking them.  Both the axe and knife she wielded are deadly weapons.  There was probable
cause to believe she was committing the felony offense of assault with a deadly weapon on a
police officer in violation of Cal. Penal Code § 245(c).[13]

In *S.R. Nehad v. Browder*, the Ninth Circuit explained that it has applied the severity of
the crime factor in two slightly different ways:  first, by applying the principle that "a particular
use of force would be more reasonable, all other things being equal, when applied against a
felony suspect than when applied against a person suspected of only a misdemeanor," and second,
by using "the severity of the crime at issue as a proxy for [the separate *Graham* factor of] the
///

---

[11]  "Every person who, except in self-defense, in the presence of any other person, draws or exhibits any deadly weapon whatsoever, other than a firearm, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a deadly weapon other than a firearm in any fight or quarrel is guilty of a misdemeanor, punishable by imprisonment in a county jail for not less than 30 days."  Cal. Penal Code § 417(a).

[12]  "Any person who commits an assault with a deadly weapon or instrument, other than a firearm, or by any means likely to produce great bodily injury upon the person of a peace officer or firefighter, and who knows or reasonably should know that the victim is a peace officer or firefighter engaged in the performance of his or her duties, when the peace officer or firefighter is engaged in the performance of his or her duties, shall be punished by imprisonment in the state prison for three, four, or five years."  Cal. Penal Code § 245(c).

[13]  Plaintiff also argues, in a footnote, that a reasonable trier of fact could infer Arvizu lacked the mental state necessary to commit the above-referenced crimes.  The California Supreme Court has held that "assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another."  *People v. Williams*, 26 Cal. 4th 779, 790 (2001); *see also People v. Parks*, 4 Cal. 3d 955, 959 (1971) (holding that assault with a deadly weapon upon a police officer requires a showing of general criminal intent, i.e., the intent to attempt to commit a battery).  Moreover, regardless of Arvizu's actual mental state, a reasonable officer in Hammon's position would have probable cause to believe that Arvizu was committing an assault.

1   danger a suspect poses at the time force is applied."  *S.R. Nehad v. Browder*, 929 F.3d 1125, 1136

2   (9th Cir. 2019).

3   The facts of *Hart v. City of Redwood City*, 99 F.4th 543 (9th Cir. 2024), are instructive in

4   assessing the severity of the crime factor in this case.  There, the police responded to a wife's 911

5   call concerning her suicidal husband who was cutting himself with a knife.  *Hart*, 99 F.4th at 543.

6   Two police officers encountered the husband in the backyard of the couples' home armed with

7   the knife.  *Id.* at 546.  One officer commanded the husband to drop the knife.  *Id.*  Instead of

8   complying, he moved towards the officers while still holding the knife and came within a few feet

9   of them in less than 5.9 seconds, before he was fatally shot.  *Id.*  The Ninth Circuit found that the

10  husband may have committed the crime of assault via his approach with the deadly weapon, and

11  that his conduct amounted to resisting arrest under California law.  *Id.* at 552–53 ("Because the

12  crimes Hart committed contributed to the immediacy of his threat to Officers Gomez and Velez,

13  the [severity of the crime] factor does not weigh against the reasonableness of the use of force.").

14  In this case, considering the evidence in the light most favorable to plaintiff, the police

15  were arguably not responding initially to any criminal conduct by Arvizu.  The evidence permits

16  the conclusion that Arvizu did not commit any crime until she started striking the axe through the

17  door, nearly hitting the officers.  However, the analysis cannot end there when the record shows

18  that, after the officers then attempted to retreat to the ground floor, Arvizu charged at the officers

19  with a knife.  Arvizu ignored Hammon's commands to stay in the room and drop the weapon, and

20  she was lunging at the officers with the knife when Hammon used deadly force.  In this context,

21  even though the officers were not initially on scene in response to criminal conduct by Arvizu, the

22  totality of the circumstances were different when deadly force was used in response to Arvizu's

23  assault on the officers.  As articulated in *Nehad*, the use of force is more likely to be considered

24  reasonable where it is in response to a serious felony—here, assault with a deadly weapon on a

25  police officer.  *See Nehad*, 929 F.3d at 1136; *see also Hart*, 99 F.4th 543, 552–53 (finding that

26  mentally ill individual who was reported suicidal may have committed crimes of resisting arrest

27  and assault under California law when he approached police officers and refused commands to

28  drop a knife.).  For these reasons, the severity of the crime factor weighs in favor of defendant

1    Hammon.

2                            iii.    Resistance or Attempt to Evade Arrest

3           While the officers did not attempt to arrest Arvizu in the few seconds between when she

4    struck the door with an axe and when she charged out of the room at the officers with a knife,

5    Arvizu ignored repeated commands to stay back and drop her weapon and instead advanced on

6    the officers.

7           A suspect's resistance "should not be understood as a binary state, with resistance being

8    either completely passive or active.  Rather, it runs the gamut from the purely passive protestor

9    who simply refuses to stand, to the individual who is physically assaulting the officer."  *Bryan v.*

10   *MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010).  Resistance "can be important when an officer is

11   facing a suspect and can observe whether that suspect is complying or resisting."  *Lowry v. City of*

12   *San Diego*, 858 F.3d 1248, 1258 (9th Cir. 2017).  "Even passive resistance may support the use of

13   some degree of governmental force if necessary to attain compliance, however 'the level of force

14   an individual's resistance will support is dependent on the factual circumstances underlying that

15   resistance.'"  *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012) (quoting *Bryan*, 630 F.3d

16   at 830).  In circumstances where an attempt to arrest a suspect was never made, the relevant

17   inquiry under this factor becomes "whether the degree of force employed may be justified by a

18   failure to comply with orders given by the officers."  *Id.*

19          Here, Arvizu's resistance reached the extreme end of the range discussed in *Bryan* once

20   she charged at the officers with the knife.  *See Bryan*, 630 F.3d at 830.  It is undisputed that

21   Arvizu did not comply with Hammon's repeated orders to stay in the room and drop the weapon.

22   Therefore, this factor also weighs in favor of defendant Hammon.

23                            iv.    Other Relevant Factors

24          Plaintiff also argues that Hammon failed to request any information about Arvizu's mental

25   health, failed to employ de-escalation tactics by standing by while Officer Engum initially opened

26   the door to Arvizu's room, created his own exigency by halting the retreat, did not consider less

27   intrusive alternatives to deadly force, and failed to give adequate warnings.  (Doc. 43 at 22–29.)

28   These arguments are addressed below.

                                            21

**Mental Illness.**  "Even when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual."  *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001).  However, while signs of mental illness are a factor to consider, the Ninth Circuit has "refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals."  *Hart v. City of Redwood City*, 99 F.4th 543, 555 (9th Cir. 2024).

Viewing the evidence in the light most favorable to plaintiff, it should have been apparent to the officers that Arvizu was suffering from a mental illness.  Dispatch reported that Arvizu was having a mental health crisis, and Hammon testified that he was concerned about a suicide by cop scenario after hearing Arvizu say she wanted to die.  These facts reduced the government's interest in using force.  But critically, the officers attempted to retreat after Arvizu struck the door with the axe.  They stopped and turned back to face the doorway only when Arvizu began to open the door while they were still on or near the landing.  Hammon then repeatedly ordered Arvizu to stay in the room and drop her weapon; instead, Arvizu charged at the officers with the knife.  During the moment force was used, the officers were confronted with a mentally ill individual who was committing a serious crime.  *Cf. Deorle*, 272 F.3d at 1285 (shooting a suspect with a beanbag round was excessive when the suspect was unarmed, mentally disturbed, and posed no risk).  Under the totality of these circumstances, Arvizu's mental state does not render Hammon's conduct unreasonable.  *Lal v. California*, 746 F.3d 1112, 1119 (9th Cir. 2014) ("That Lal may have been intent on committing 'suicide by cop' does not negate the fact that he threatened the officers with such immediate serious harm that shooting him was a reasonable response.").

**Pre-Shooting Conduct.**  "[T]he events leading up to the shooting, including the officers['] tactics, are encompassed in the facts and circumstances for the reasonableness analysis."  *Vos v. City of Newport Beach*, 892 F.3d 1024, 1034 (9th Cir. 2018).

Plaintiff cites *A.K.H. v. City of Tustin*, 837 F.3d 1005 (9th Cir. 2016), for the proposition that a quick escalation to deadly force is unreasonable.  In that case, the police encountered the suspect of a 911 domestic violence call walking on the side of a road after the dispute had ended

1    and out of the presence of the reporting victim.  *Id.* at 1011.  The suspect had no weapon, and the

2    officers were told he was not known to carry weapons.  *Id.* at 1012.  The suspect ignored

3    commands to stop and instead placed his hand in his pocket while continuing to skip and walk

4    backwards while facing the officer who drove behind him.  *Id.*  A second officer pulled forward

5    to cut off the suspect's escape, warned the suspect to remove his hand from his pocket, and shot

6    twice from his vehicle as the suspect complied.  *Id.*  Less than one second elapsed between the

7    second officer's command and decision to shoot, and the suspect was fatally shot less than one

8    minute after the police first encountered him.  *Id.*  Under these circumstances the Ninth Circuit

9    found that the use of deadly force violated the Fourth Amendment.  *Id.* at 1013.

10          The circumstances here are distinguishable.  The officers in this case did not have the

11   protection of being in their vehicles, they were responding to a domestic violence call, they

12   attempted to ascertain Arvizu's situation quickly upon arriving at the scene, and they could not

13   see her during most of the interaction because she was behind a closed door.  Even assuming, as

14   plaintiff suggests, that Hammon's failure to stop Engum from opening the door was an

15   acquiescence in a rush to use force, Engum immediately re-shut the door when he saw Arvizu

16   was holding an axe.  Shortly thereafter, the officers attempted to retreat after Arvizu struck the

17   door with the axe.  In retreating, the officers were attempting to de-escalate the situation, which

18   would potentially have provided time for other measures to be used had Arvizu not charged out of

19   the room at them less than ten seconds later.  Plaintiff's argument essentially is that the officers

20   used poor tactics in quickly responding to Arvizu's room and in initially opening her door, but it

21   was not unreasonable for them to attempt to ascertain Arvizu's situation immediately upon

22   arriving.  Moreover, "a Fourth Amendment violation cannot be established based merely on bad

23   tactics that result in a deadly confrontation that could have been avoided."  *Vos*, 892 F.3d at 1034

24   (internal quotation marks and citations omitted).  The court in *A.K.H. v. City of Tustin* placed an

25   emphasis on the defendant officer's rush to use force, under circumstances where the severity of

26   the crime and immediacy of the threat factors favored the plaintiff, while the resistance factor

27   only slightly favored the officers.  *A.K.H.*, 837 F.3d at 1011–13.  Here, the officers did not rush to

28   use force, they attempted to retreat, and Hammon shot only when Arvizu attacked the officers

1    with the knife.  Also, unlike in *A.K.H.*, here the *Graham* factors all favor the defendant.

2           Mr. Arvizu also cites *S.R. Nehad v. Browder*, 929 F.3d 1125, 1136 (9th Cir. 2019), for the

3    proposition that where an officer creates the danger necessitating lethal force, "[r]easonable triers

4    of fact can, taking the totality of the circumstances into account, conclude that an officer's poor

5    judgment or lack of preparedness caused him or her to act unreasonably, 'with undue haste.'"

6    *S.R. Nehad v. Browder*, 929 F.3d 1125, 1135 (9th Cir. 2019) (quoting *Torres v. City of Madera*,

7    648 F.3d 1119, 1126 (9th Cir. 2011)).  In *Nehad,* the defendant officer responded to a call of a

8    suspect making threats with a knife and encountered that suspect walking towards his police car

9    in an alley.  *Id.* at 1130–31.  The officer did not activate his police lights, identify himself as a

10   police officer, or issue a warning during the approximate minute the interaction lasted.  *Id.*  Less

11   than five seconds after exiting his vehicle, the officer fatally shot the suspect—who was

12   unarmed—from roughly seventeen feet away.  *Id.* at 1131.  The Ninth Circuit found doubt as to

13   the officer's credibility given his conflicting accounts of the incident, doubt as to whether he

14   reasonably mistook the suspect's pen for a knife, doubt as to whether the suspect would have

15   posed a threat even if armed, and support from which to conclude that the officer created his own

16   sense of urgency.  *Id.* at 1133–1135.  Specifically, support was found via the suspect's slow and

17   nonthreatening approach, the existence of sufficient lighting to distinguish a pen from a knife, the

18   officer's failure to identify or provide warning, and an expert opinion that the officer had

19   sufficient time to make an alternative decision.  *Id.* at 1135.

20          In contrast, the events of this case occurred in a confined setting, the officers identified

21   themselves, Arvizu was armed with an axe and knife, the officers attempted unsuccessfully to

22   retreat, and Arvizu quickly advanced on the officers with a weapon.  The entire interaction was

23   captured by multiple body camera videos, and there are no conflicting accounts of the incident.

24          Plaintiff's arguments fail to establish more than a "metaphysical doubt," *Matsushita Elec.*

25   *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), because they focus on what the

26   officers *could* have done differently in the first minute or two of their arrival and how Arvizu

27   *might* have responded.  Plaintiff relies on a report prepared by his police practices expert, Osuna,

28   who opines, among other things, that the officers should not have initially opened the door to

Arvizu's room and should have retreated earlier in the interaction.  (Doc. 43-4.)  However, when they first arrived on the scene the officers faced a reasonable concern with Arvizu's safety due to the nature of the call.  Additionally, the officers' entire interaction with Arvizu occurred over less than three minutes, and the officers tried to retreat after Arvizu began to act violently.  The expert's opinion that the officers should have acted more cautiously in the first minute or two upon arriving does not preclude summary judgment where the use of force was consistent with the Fourth Amendment given the totality of the circumstances.  *See Lal v. California*, 746 F.3d 1112, 1118 (9th Cir. 2014) (recognizing Ninth Circuit precedent prevents "a plaintiff from avoiding summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless."); *see also City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 616 (2015) (applying same principle to similar police expert report under clearly established prong of qualified immunity); *Vos v. City of Newport Beach*, 892 F.3d 1024, 1034 (9th Cir. 2018) (Fourth Amendment violation cannot be "based merely on bad tactics that result in a deadly confrontation that could have been avoided").

**Availability of Less Intrusive Alternatives.**  "[I]t is well settled that officers need not employ the least intrusive means available so long as they act within a range of reasonable conduct."  *Glenn v. Washington Cnty.*, 673 F.3d 864, 878 (9th Cir. 2011).  Plaintiff does not specifically identify alternative steps the officers should have taken or explain how those alternatives would have been available in this instance.  (Doc. 43 at 28.)  Sergeant Alvarado testified that a riot shield is not normally kept in his police vehicle, but that he could make a call for one if needed.  (Doc. 43-3 at 97–98.)  However, it is not clear that a riot shield would have arrived in time to be utilized given how quickly the situation developed.  The same is true of calling in a negotiator, assuming one was available to respond.  Moreover, the officers in this case attempted to retreat to the ground floor; they turned back to confront Arvizu only when she started to open the door while they were still only a few feet away.  Had the officers been able to complete their retreat, it is certainly possible that other, less deadly means might have been deployed.  Unfortunately, Arvizu's conduct prevented the officers from retreating.  Regardless of

1    plaintiff's speculation as to possible alternative approaches, here Hammon used deadly force only

2    in response to Arvizu charging at him with a knife from a few feet away.  His specific conduct

3    fell within what Ninth Circuit precedent has held is reasonable under the Fourth Amendment.

4    *See, e.g.*, *Hart v. City of Redwood City*, 99 F.4th 543, 552 (9th Cir. 2024).

5         **Warnings.**  In general, "an officer must give a warning before using deadly force

6    'whenever practicable.'"  *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014)

7    (quoting *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997)); *Tennessee v. Garner*, 471 U.S.

8    1, 11–12 (1985) (warnings required "where feasible").  "To be sure, on its own, the absence of a

9    warning does not necessarily mean that deadly force was unreasonable."  *Calonge v. City of San*

10   *Jose*, 104 F.4th 39, 47 (9th Cir. 2024) (internal quotation marks and alteration omitted).

11        Here, Hammon did not warn Arvizu that he would use deadly force, but he warned her to

12   stay in the room and to drop her weapon.  Arvizu was behind a mostly closed door when

13   Hammon gave those warnings, and he could not know she had disobeyed his warnings until she

14   quickly opened the door and charged at him.  With only a second or two until Arvizu reached

15   him, at that point it was neither practicable nor feasible for him to provide a further warning and

16   wait to see if Arvizu would comply.  *Cf. Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010)

17   (finding that issuing a warning would have been feasible because "there was ample time to give

18   that order or warning and no reason whatsoever not to do so.").  Plaintiff argues "that Krystal was

19   delusional and incapable of understanding Hammon's shouted commands which were, in fact,

20   only further provocation."[14]  (Doc. 43 at 29.)  However, if this speculation were true and Arvizu

21   was incapable of understanding Hammon's commands, it is not clear how issuing a further

22   warning would have stopped her from charging the officers.  For these reasons, no reasonable

23   jury could weigh this consideration for plaintiff.

24        In determining whether Hammon's conduct was constitutionally reasonable, the court

25   must "balance the gravity of the intrusion on the individual against the government's need for that

26

---

27   [14]  To the extent this argument implicates the now-abrogated provocation rule, *Billington v. Smith*,
     292 F.3d 1177, 1189 (9th Cir. 2002), *abrogated by Cnty. of Los Angeles, Calif. v. Mendez*, 581

28   U.S. 420 (2017), it is unpersuasive.

intrusion." *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003).  As discussed, the use of deadly force was the most severe intrusion on Arvizu's Fourth Amendment interests.  Considering the totality of the circumstances facing the officers at the time, the court finds that defendant Hammon's use of force was nonetheless reasonable under the Fourth Amendment.  Summary judgment is appropriate in this case because every *Graham* factor favors the defendant, and no reasonable jury could return a verdict in plaintiff's favor based on the facts in this case.

> b.   *Clearly Established Law*

Defendant Hammon is also entitled to qualified immunity because his conduct did not violate clearly established law.  "The law is clearly established when precedent is 'clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.'"  *Calonge v. City of San Jose*, 104 F.4th 39, 47 (9th Cir. 2024) (quoting *D.C. v. Wesby*, 583 U.S. 48, 63 (2018)).  "The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority."  *Smith v. Agdeppa*, 81 F.4th 994, 1001 (9th Cir. 2023) (internal quotation marks omitted).  "Although '[the Supreme] Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.'"  *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 78–79 (2017)).  "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Wesby*, 583 U.S. at 63 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The Supreme Court has repeatedly told courts not to define clearly established law at a high level of generality.  *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 613 (2015).  "[S]pecificity is especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts."  *Kisela*, 584 U.S. at 104 (first alteration in original) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).  "An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official *in the defendant's shoes* would have understood that he was violating it.'"  *Id.* at 105 (emphasis added) (quoting *Plumhoff*

1   *v. Rickard*, 572 U.S. 765, 778–79 (2014)).  In qualified immunity cases, the plaintiff bears the

2   burden of demonstrating that the law was clearly established.  *Hart v. City of Redwood City*, 99

3   F.4th 543, 555 (9th Cir. 2024) (citing *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946

4   (9th Cir. 2017)).

5       Here, the court looks to judicial decisions issued before June 8, 2019, to determine

6   whether the law was clearly established such that Hammon had fair notice that his challenged

7   conduct was unconstitutional.  *Kisela*, 584 U.S. at 107.  The core rule plaintiff appears to be

8   seeking to apply to this case is "that an officers' actions may violate the Fourth Amendment if the

9   officer played a role in creating the dangerous situation that required lethal force."  (Doc. 43 at

10  29.)

11      The first relevant decision plaintiff provides is *Hung Lam v. City of San Jose*, 869 F.3d

12  1077 (9th Cir. 2017).  In *Hung Lam*, the Ninth Circuit held that the district court's failure to

13  instruct the jury that a Fourth Amendment violation cannot be premised solely on bad tactics was

14  not an abuse of discretion, when the jury was charged to consider all the circumstances under the

15  general rubric of reasonableness.  *Id.* at 1087.  This decision reflects that officers' pre-shooting

16  conduct may be considered as part of the totality of the circumstances.  *Hung Lam* involved a

17  police officer who shot in the back a mentally ill suspect holding a knife, the shooting occurred

18  outside, and it was disputed whether the suspect had advanced on the defendant officer.  *Id.*  In

19  contrast, here the pre-shooting circumstances include that the officers had been on the scene for

20  less than three minutes, they had attempted to retreat after Arvizu became violent with the axe,

21  and the shooting occurred only when Arvizu charged the officers with a knife.  *Hung Lam* does

22  not establish that defendant Hammon's conduct was unconstitutional under the specific

23  circumstances he faced.

24      Next, plaintiff cites *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528 (9th Cir.

25  2010).  In *Espinosa*, the police received a call that an apartment's front door was swinging open

26  and that it could possibly be a drug house.  *Id.* at 532.  The three defendant officers found the

27  apartment's door closed on arrival but breached the door and discovered a bloody shirt.  *Id.*

28  While searching the second floor of the apartment, the officers kicked open a locked door and

arrested a cooperative resident who had a knife in his possession.  *Id.* at 533.  The officers could

hear noise coming from the attic, so they climbed into the attic with flashlights and guns drawn.

*Id.*  They encountered an individual who failed to put his hands up as instructed.  *Id.*  Two of the

officers fatally shot the individual because they thought he might have a weapon, but the

individual was unarmed.  *Id.*

Under these circumstances, the Ninth Circuit held that questions of fact precluded

summary judgment.  *Id.* at 537–38.  Specifically, the Ninth Circuit reasoned that there was a "low

level of threat" when the defendant officers entered the attic.  *Id.* at 538.  And when the officers

fired twenty-five shots at the unarmed individual, he "had not been accused of any crime.  He was

not a threat to the public and could not escape.  He had not initially caused this situation.  He had

not brandished a weapon, spoken of a weapon, or threatened to use a weapon."  Unlike in

*Espinosa*, Arvizu threatened the officers with an axe and a knife.  Here, unlike in *Espinosa*, the

officers never entered Arvizu's room; Engum briefly opened the door to the room but quickly

shut it when he saw that Arvizu was holding an axe.  The officers started to retreat after Arvizu

struck the door with the axe, they stopped retreating and turned to face the door only when she

started to open it, and Hammon gave repeated commands for Arvizu to stay in the room and drop

the weapon.  Less than 10 seconds later, Hammon had to quickly react when Arvizu charged him

with the knife.  As such, *Espinosa* does not clearly establish that Hammon's conduct violated the

Fourth Amendment.

Plaintiff also points to *Torres v. City of Madera*, 648 F.3d 1119 (9th Cir. 2011).  In that

case a police officer lethally shot a suspect who had already been arrested, handcuffed, and placed

in the back seat of a patrol car for thirty to forty-five minutes when the suspect began yelling and

kicking the rear car door from inside.  *Id.* at 1121.  The officer intended to use her taser but

mistakenly used her firearm.  *Id.*  As relevant to plaintiff's argument, *Torres* established that "a

reasonable jury could conclude that [the officer's] own poor judgment and lack of preparedness

caused her to act with undue haste."  *Id.* at 1126.  The Ninth Circuit explained that "this is a case

where the suspect was already arrested, handcuffed, and in the back seat of a patrol car.  There is

no suggestion that [the suspect] was armed, that he was fleeing, or that he posed a threat to any

1    officers or anyone else." *Id.* at 1128.  For the reasons already addressed above, "the differences

2    between [*Torres*] and the case [at hand] leap from the page." *City & Cnty. of San Francisco,*

3    *Calif. v. Sheehan*, 575 U.S. 600, 614 (2015).  *Torres* does not clearly establish that Hammon's

4    conduct was unlawful.

5          The last case Mr. Arvizu advances is *S.R. Nehad v. Browder*, 929 F.3d 1125, 1130 (9th

6    Cir. 2019).  As addressed above, *Nehad* is factually distinguishable from the present case and

7    does not clearly establish the unconstitutionality of Hammon's conduct.  Rather, the Ninth Circuit

8    has held that "where a suspect threatens an officer with a weapon such as a gun or a knife, the

9    officer is justified in using deadly force." *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir.

10   2005) (en banc) (collecting cases), *disapproved of on other grounds by Lemos v. Cnty. of Sonoma*,

11   40 F.4th 1002 (9th Cir. 2022).

12         Accordingly, the court concludes that defendant Hammon's use of deadly force was not a

13   violation of clearly established law.  Defendants' motion for summary judgment as to plaintiff's

14   Fourth Amendment excessive force claim against defendant Hammon is granted.

15                2.    Supervisory Liability:  Sergeant Alvarado

16         "A supervisory official is liable under § 1983 so long as 'there exists either (1) his or her

17   personal involvement in the constitutional deprivation, or (2) a sufficient causal connection

18   between the supervisor's wrongful conduct and the constitutional violation.'" *Rodriguez v. Cnty.*

19   *of Los Angeles*, 891 F.3d 776, 798 (9th Cir. 2018) (citation omitted).  "The requisite causal

20   connection can be established . . . by setting in motion a series of acts by others or by knowingly

21   refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably

22   should have known would cause others to inflict a constitutional injury." *Id.* (quoting *Starr v.*

23   *Baca*, 652 F.3d 1202, 1207–08 (9th Cir. 2011)).  Accordingly, "a supervisor may be liable in his

24   individual capacity 'for his own culpable action or inaction in the training, supervision, or control

25   of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that

26   showed a reckless or callous indifference to the rights of others.'" *Id.* (citation omitted).

27         It is undisputed that Alvarado did not personally and directly commit any constitutional

28   violation against Arvizu.  Plaintiff instead seeks to hold him liable in a supervisory capacity or as

                                                  30

an integral participant by arguing that he failed to abide by FPD Procedure 417—which plaintiff claims he should have known applied to the situation at hand—and that Arvizu's death was a proximate result of his inaction. (Doc. 43 at 13.) Plaintiff's arguments fail to demonstrate "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation," *Rodriguez*, 891 F.3d at 798, as the court finds that the underlying conduct by Hammon was not a constitutional violation.[15] Accordingly, defendants' motion for summary judgment as to plaintiff's Fourth Amendment excessive force claim against defendant Alvarado is also granted.

## CONCLUSION

For the reasons explained above:

1.    The Clerk of the Court is directed to update the docket to reflect that the City of Fresno was terminated as a named defendant in this action on January 12, 2024;

2.    Defendants' evidentiary objections (Doc. 44-3) are overruled as set forth above;

3.    Defendants' motion for summary judgment (Doc. 38) is granted;

4.    The Clerk of the Court is directed to enter judgment for defendants Hammon and Alvarado; and

5.    The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Dated:   August 9, 2024

_____
UNITED STATES DISTRICT JUDGE

---

[15] The same is true under a theory of integral participation, as "defendants cannot be held liable for a constitutional violation under 42 U.S.C. § 1983 unless they were integral participants in the *unlawful* conduct." *Keates v. Koile*, 883 F.3d 1228, 1241 (9th Cir. 2018) (emphasis added).